**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KELLY TENINTY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 08-CV-5287 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| PETE GEREN, SECRETARY OF THE ARMY, | ) | |
| ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In February 2007, Defendants Secretary of the Army and United States Department of the Army (collectively referred to as "Defendant" or "the Army")[1] hired Plaintiff Kelly Teninty, a white female, for a civilian position as a health technician at the Military Entrance Processing Station ("MEPS") in Chicago. Eight months later, she was terminated. Plaintiff's four-count amended consolidated complaint alleges employment discrimination based on gender, race, and disability and also alleges that she was subject to a hostile work environment created by African-American staff members. Defendants filed a motion for summary judgment [52] on all of Plaintiff's claims. For the following reasons, the Court grants Defendants' motion [52].

**I.      Background**

**A.      Plaintiff's Response to Defendant's Statement of Facts**

It is the function of the Court to review carefully statements of material facts and to eliminate from consideration any argument, conclusions, and assertions that are unsupported by the documented evidence of record offered in support of the statement. See, *e.g.*, *Sullivan v. Henry Smid Plumbing & Heating Co., Inc.*, 2006 WL 980740, *2 n.2 (N.D. Ill. Apr. 10, 2006);

---

[1]      Because Plaintiff needed only to sue one defendant (not both the Secretary and the Army), the Court refers to Defendant in the singular throughout this opinion.

*Tibbetts v. RadioShack Corp.*, 2004 WL 2203418, at *16 (N.D. Ill. Sept. 29, 2004); *Rosado v. Taylor*, 324 F. Supp. 2d 917, 920 n.1 (N.D. Ind. 2004). "Pleadings that do not conform with the local rules may be stricken at the discretion of the court." *Id.* at 640 (citing *Bell, Boyd & Lloyd v. Tapy*, 896 F.2d 1101, 1103 (7th Cir. 1990)); *Pfeil v. Rogers*, 757 F.2d 850, 858 (7th Cir. 1985); *Graham v. Security Sav. & Loan*, 125 F.R.D. 687, 688-89 (N.D. Ind. 1989), *aff'd*, 914 F.2d 909 (7th Cir. 1990)). The Court's scrutiny of material statements of facts applies equally to the party seeking summary judgment and the party opposing it.

Plaintiff's LR 56.1 response ("Pl.'s 56.1 Resp.") admits the majority of facts as set forth by the Army, and therefore those facts are deemed admitted for purposes of the summary judgment motion. See Pl.'s 56.1 Resp. ¶¶ 1-6, 8-10, 20-21, 23, 32-33, 41, 46-51, 54-56, 57, 59. For a number of additional allegations, Plaintiff admits that the cited evidence supports the fact, but denies the accuracy of the fact, without citing to any evidentiary materials that would support her qualified denial. See Pl.'s 56.1 Resp. ¶¶ 11-19, 22, 24-31, 34-36, 38-40, 42-44, 58, 60-61. Finally, Plaintiff denies certain facts without citing to any evidence to refute such facts. See Pl.'s 56.1 Resp. ¶¶ 37, 45. In two additional denials, Plaintiff denies the fact as the Army states it, but cites to the same deposition testimony in support of its denial. See Pl.'s 56.1 Resp. ¶¶ 52-53.[2] Such denials, with no evidentiary support, are not sufficient to defeat summary judgment; rather, a nonmovant must support each denial with specific citations to the record or to supporting materials or affidavits that support their denial. See, *e.g., Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527-29 (7th Cir. 2000) (affirming summary judgment when district

---

[2] With regard to these two denials, it appears the denials represent legal argument, rather than a denial of the substance of the cited deposition testimony. Specifically, Plaintiff seems to be arguing that she has not abandoned her claim that her termination was an act of disability discrimination and that the alleged hostile work environment was motivated by her disability, although Defendants have cited deposition testimony to the contrary. Thus, the substance of those allegations will be addressed in this brief.

judge struck plaintiff's entire LR 12 (now LR 56.1) statement); *McGuire v. UPS*, 152 F.3d 673, 675 (7th Cir. 1998) ("An answer that does not deny the allegations in the numbered paragraphs with citations to supporting evidence in the record constitutes an admission.") (internal citations omitted); *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) ("[A] general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial.").

In sum, any statements or responses by either party that contain legal conclusions or argument, are evasive, contain hearsay or are not based on personal knowledge, are irrelevant, or are not supported by evidence in the record will not be considered by the Court in ruling on Defendant's motion for summary judgment. Any paragraph or fact that is not supported by record evidence will be disregarded. Indeed, the Court has not relied on any evidence as to which the admissibility is disputed in its disposition of Defendant's motion for summary judgment.

**B. Facts**

Plaintiff Kelly Teninty, a white female, worked at MEPS, the Army's processing facility for recruits, as a health technician for approximately eight months in 2007. [2] On February 5, 2007, Plaintiff was hired by Defendants to work as a health technician at the Chicago Military Entrance Processing Station ("MEPS") located at 1700 South Wolf Road, Des Plaines, Illinois. The health technician position is rated as a GS-4 position and requires that a candidate perform approximately 20 formal job duties, including the performance of medical and drug testing of

---

[2] Plaintiff had three years of military service when she was hired as a health technician by MEPS. From September 28, 1981 to September 27, 1984, Plaintiff was an Army Field Medic in the United States Army. While in the Army, Plaintiff was assigned to the Second Battalion Trainees Academy of Health Sciences United and trained as a 91B10 service member. On September 26, 1983, Plaintiff was awarded the Expert Field Medical Badge, a special skill award for recognition of exceptional competence and outstanding performance by field medical personnel.

applicants for armed forces enlistment, and the performance of health and medical physicals for officer candidates, as well as active and reserve forces personnel. One of the functions of MEPS health technicians is the drawing of Army applicants' blood.[3] At the time that she was hired by the Army, Teninty did not possess a bachelor or associate degree, but had obtained certification in phlebotomy (the drawing of blood from a vein) from Moraine Valley Community College, and had worked for approximately two years as a phlebotomist. As previously noted, she also had been awarded the Expert Field Medical Badge during her three years of prior military service. The Army hired Teninty at the standard rate of pay for health technicians, which was GS-4, step 1.

Between 2000 and 2008, the Army hired about thirteen GS-4 health technicians, including Teninty: eight males and five females. Of the eight males, three were appointed at pay rates higher than the minimum rate set for the position (GS-4, step 1) after the Army determined that they possessed superior qualifications for the position. Ricky Kirkland was hired at GS-4, step 9. Prior to being hired into the health technician position with the Chicago MEPS, Kirkland had been stationed at the Chicago MEPS as a medic with the Navy. Kirkland retired from the Navy with 20 years of medical experience, including experience as a supervisor at five military medical clinics in the U.S. and Japan. Steven Kulik was hired at a GS-4, step 5. At the time Kulik was hired, he had a bachelor's and an associate's degree. Kulik also had nine years experience performing physical examinations and was a certified EMT. Michael Gamez was hired at a GS-4, step 4. At the time Gamez was hired, he had been a certified EMT for seven years, had served as an army combat medic for four years, and had worked with patients in private clinics and hospitals for over four years.

---

[3]    A phlebotomy technician certificate is not required in order to work as a health technician at the Chicago MEPS.

Another male health technician, Christopher Parks, transferred from a similar federal position with the VA and was appointed to the MEPS position at his current federal rate of pay (GS-4, step 3). With the VA, Parks had been earning a GS-4, step 3 salary. Parks had more than fifteen years of phlebotomy training from his years as an Army combat medical specialist, four years working in a VA hospital as a healthcare technician, and several years working as an EMT with civilian emergency medical services. The four other males hired between 2000 and 2008 were hired as GS-4, Step 1.

After Plaintiff began working at the Chicago facility in February 2007, she was counseled by her supervisors on several occasions. In March 2007, Lieutenant Korljan, a white MEPS operations officer and at the time her interim supervisor, told Plaintiff to resolve any questions or concerns through her section lead and that his door was open as well. In May 2007, Korljan counseled Plaintiff again. The counseling record reflects that Korljan had concerns about how Plaintiff was adjusting to the section and "at times demonstrated a very aggressive and stand offish attitude to both the section leads and [her] co-workers." Korljan wrote that Plaintiff seemed "content not being part of the team." He also observed that she was often very angry with co-workers and did not receive instructions well.

Two weeks after Plaintiff's May 2007 performance counseling, Korljan counseled Plaintiff again, along with two other employees, regarding an incident between the three employees that Korljan observed. At the time, he spoke with each individually and informed them that they were expected to work out any differences in a professional manner. Also during Plaintiff's employment, Alphonso Jones, one of the medical section's lead health technicians, spoke to Korljan about Plaintiff, expressing his opinion that she was unteachable, rude, and would not listen.

In June 2007, Mary Walker, an African-American female, began working at Chicago MEPS as the supervisor for the medical staff and thus Plaintiff's immediate supervisor. Walker testified that she was not aware that Plaintiff had been diagnosed with an anxiety disorder. Walker testified that she observed Plaintiff on a number of occasions being rude to other staff members, shouting and yelling at co-workers, and getting into disputes with the Chicago MEPS chief medical officer. Walker also observed that Plaintiff had difficulty working as a team member and tried to give Plaintiff tasks that would allow her to work alone, away from other staff. On August 24, 2007, Walker issued Plaintiff a written counseling form, in which Walker requested that Plaintiff not concern herself with other employees, that she keep her focus, and that she request a break from either the lead technician or the supervisor if she felt upset or anxious.

On September 8, 2007, Korljan again counseled Plaintiff regarding an argument that he observed between Plaintiff and a co-worker. In his memorandum summarizing the incident, Korljan wrote that Plaintiff "has had difficulty adapting to working with the other employees in the medical section" and that she "has gotten into verbal confrontations similar to the one described above with almost every one of her co-workers in the medical section, as well as the chief medical officer and [the] in house psychologist." Korljan also noted his belief that Plaintiff "either does not understand or does not accept the fact that her own actions are the catalyst behind many of the controversy [sic] she finds herself in, and has not demonstrated that she is going to be able or willing to change her behavior." On September 11, 2007, the chief medical officer, C.S. Ochoco-Madamba, M.D., wrote a memorandum stating that Plaintiff "is the most difficult person to deal with," that she is "very bossy and refused on several occasions to read the

regulations when confronted that she was performing certain tasks the wrong way," and that she "will do things the way she wants it done, will leave the medical section anytime she wants to."

Four days later, on September 12, Walker wrote another memorandum in which she observed that Plaintiff was being rude with other staff members and had been disruptive. Walker also wrote that she had discussed these issues with Plaintiff and instructed her to "change her behavior." Then, on November 2, 2007, Walker again met with Plaintiff to discuss her problems with the medical section. The stated "purpose of counseling" was to discuss Plaintiff's "reckless behavior," her "ability to deal with co-workers and physicians," and "personal problems (if any) that may hinder or cause a negative response in the workplace." In the summary section, Walker noted that Plaintiff has regular shouting "outbursts." She also described a situation that occurred that day, in which the chief medical officer was "trying to let you know you were doing the briefing incorrectly and you did not respond to her in a professional manner." She further noted that "when corrected or asked to do something out of sync," Plaintiff's response is "very brutal and unprofessional." In the "plan of action" section, Walker noted that Plaintiff needed to (1) change her behavior immediately, (2) alert Walker about any medical condition or personal problems causing the outbursts, (3) prepare to come to work with a good attitude, (4) know that arguing and shouting will not be tolerated in the workplace, and (5) communicate with staff and the physician in a professional matter.

Korljan ultimately decided, with input from Walker and other Army personnel, that Teninty did not possess the demeanor or attitude necessary to be a successful health technician with the Army. On November 13, 2007, Korljan informed Plaintiff that she was being terminated effective November 26, 2007. Korljan testified that the decision to terminate Plaintiff was made because there was a repeated pattern of behavior that indicated that she did not possess

the demeanor or attitude necessary to work at the Chicago MEPS and based on the specific instances that had been described in written memoranda from Korljan and Walker.

Following her termination, Teninty sought EEO counseling and ultimately filed a formal complaint of discrimination. In Plaintiff's statement of facts, she provided very few specific details about the alleged harassment; rather, Plaintiff merely made the following general assertions: (1) her "co-workers verbally abused her and harassed her because of her disability"; (2) "African-American MEPS employees racially discriminated against Plaintiff"; and (3) co-workers who worked as "lead-techs" "regularly engaged in racial discrimination against Plaintiff" and also "regularly harassed and discriminated against Plaintiff because of her disability. The only specific reference that Plaintiff made in her statement of facts was that "Plaintiff was the victim of a verbal and physical attack by one of her African-American co-workers, Mr. Jones." Plaintiff did not describe when and where the alleged attack occurred, nor did she provide any specific details regarding the attack. Plaintiff did not relate dates, specific individuals, or specific actions and behavior in referencing any of the alleged harassment and discrimination.

In support of her disability discrimination claim, Teninty produced documentation that she had been diagnosed with an anxiety disorder in March 2007 and began taking medication. Plaintiff contends that her supervisor and co-workers knew that she had a disorder and that she was taking medication for it. Defendant maintains that Plaintiff's supervisors and co-workers did not know she had been diagnosed with an anxiety disorder; however, Kulik testified that Plaintiff seemed to be "bipolar," meaning she had split personalities and "highs and lows." It is undisputed that Plaintiff did not provide the Army with any documentation about her medical

condition until she contacted an EEO counselor in November 2007.  Plaintiff also did not request any accommodations.

After the denial of her EEO complaint, Teninty filed two actions, which were subsequently consolidated before this Court.  Her consolidated complaint alleges employment discrimination based on gender, "wage scale differentials," and race and also alleges discrimination based on Plaintiff's disability in that Defendant failed to reasonably accommodate Plaintiff's alleged disability.  It appears from the complaint that she alleges both discrimination in her termination and that she suffered a hostile work environment based on her sex, race and disability.  In Plaintiff's response to Defendant's statement of facts, Plaintiff admitted that she abandoned her age discrimination claim and that her gender discrimination claim is limited solely to the issue of disparate pay.

## II.     Summary Judgment Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party."  *Foley v. City of Lafayette, Ind.,* 359 F.3d 925, 928 (7th Cir. 2004).  To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted).   A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact.

See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252.

No heightened standard of summary judgment exists in employment discrimination cases, nor is there a separate rule of civil procedure governing summary judgment in employment cases. *Alexander v. Wisconsin Dept. of Health and Family Servs.*, 263 F.3d 673, 681 (7th Cir. 2001) (citing *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997)). However, intent and credibility frequently are critical issues in employment cases that in many instances are genuinely contestable and not appropriate for a court to decide on summary judgment. See *id.* Nevertheless, summary judgment in favor of the defendant is hardly unknown or, for that matter, rare in employment discrimination cases. *Wallace*, 103 F.3d at 1396.

## III.    Analysis

### A.    Equal Pay Act Claim

Even assuming that the Court has jurisdiction over Plaintiff's Equal Pay Act claim—a debatable proposition depending on whether Plaintiff seeks damages in excess of $10,000—the Army is entitled to summary judgment. In order to demonstrate a *prima facie* case for a violation of the Equal Pay Act (or disparate pay under Title VII), Plaintiff must demonstrate that: (1) different wages were paid to employees of the opposite sex; (2) the employees are

performing equal work which requires equal skill, effort and responsibility; and (3) the employees have similar working conditions. See *Markel v. Bd. of Regents of the Univ. of Wisc. Sys.*, 276 F.3d 906, 912-913 (7th Cir. 2002) (quoting *Fallon v. Illinois*, 882 F.2d 1206, 1208-09 (7th Cir. 1989)). For purposes of summary judgment, Defendant concedes that Plaintiff has established a *prima facie* case under the Equal Pay Act. Specifically, the Army admits that four of the eight male health technicians hired between 2000 and 2008 began their employment at pay rates higher than that of Plaintiff; thus, she has established a *prima facie* case. However, once a plaintiff has established a *prima facie* case, the employer may respond by showing that the pay differential is explained by one of four recognized exceptions to the Equal Pay Act: (1) a seniority system; (2) a merit system; (3) a system that measures earning by quantity or quality of production; or (4) any factor other than sex. See 29 U.S.C. § 206(d); *Markel*, 276 F.3d at 913 (quoting *Fallon v. Illinois*, 882 F.2d at 1211).[1] The Army maintains that the difference in pay between Plaintiff and the four males who were hired at higher salaries was based on an established merit system, namely, the "GS" or government scale.

Typically, federal agencies must make appointments at the minimum rate of the appropriate grade (or "GS" level). 5 U.S.C. § 5333. However, under regulations prescribed by the Office of Personnel Management, all agencies have the authority to make new appointments "at such a rate above the minimum rate of the appropriate grade." *Id.* Under the applicable Office of Professional Management ("OPM") regulations, the Army is authorized to set a new employee's rate of basic pay above the minimum rate if it determines that the employee has superior qualifications. See 5 C.F.R. § 531.212(b). A "superior qualifications" determination

---

[1] This requirement is not unlike Title VII's requirement that a defendant offer a legitimate business reason for the disparity. Thus, while attempting to meet its burden under the Equal Pay Act, Defendant also offers a legitimate business reason for Plaintiff's disparate pay claim under Title VII.

may be "based on the level, type or quality of the candidate's skills or competencies demonstrated or obtained through experience and/or education, the quality of the candidate's accomplishments compared to others in the field, or other factors."  5 C.F.R. § 531.212(b)(1). An agency also has the authority to appoint a current federal employee by transfer.  See 5 C.F.R. § 315.501.

Here, the Army maintains that it elected to exercise its authority under § 531.212(b) in the cases of Ricky Kirkland, Steven Kulik, and Michael Gamez, and hired each of these employees at rates above GS-4, step 1, because each possessed superior qualifications for the position.  For example, Defendant has presented evidence that the Army hired Ricky Kirkland at a rate of GS-4, step 9, because he had retired from the Navy with 20 years of medical experience, including experience as a supervisor at five military medical clinics in the U.S. and in Japan.[4] Similarly, Defendants presented evidence that Steve Kulik was hired at a GS-4, step 5 rate because he held both a bachelor degree and an associate degree, and had nine years equivalent experience performing physical examinations, was a certified EMT, and received numerous military service awards.  Finally, Gamez was hired at a GS-4, step 4 rate because he had been a certified EMT for about seven years, had served as an army combat medic for over four years, and had over four years of experience working with patients in private clinics and hospitals.  In contrast, the undisputed evidence shows that Plaintiff had less than two years of experience as a phlebotomist, did not have a bachelor or associate degree, and had received only a phlebotomy certification.  Furthermore, her military experience ended approximately twenty-five years prior to being hired at MEPS.

---

[4]    Plaintiff's only argument regarding Kirkland's qualifications is that he had no "credible military experience" at the time he was hired.  However, the record reflects that Kirkland had 20 years of medical experience with the Navy, including supervisory authority at five military medical clinics in the U.S. and abroad.

Plaintiff also alleges that the Army violated the Equal Pay Act when it hired Christopher Parks as a GS-4, step 3 health technician. However, Parks was a VA employee at the time that he was hired, and already was employed at the GS-4, step 3 rate. As such, the Army was authorized to appoint Parks as a transfer, and to pay him at a rate equal to the rate of his position at the VA. See 5 C.F.R. § 315.501.

In her response, Plaintiff argues that the Army's merit system is vague and ambiguous and allows for "vast discrepancies" as to what constitutes "superior qualifications." However, the case law makes clear that as long as each pay discrepancy is explained by some factor other than sex, the Army is entitled to summary judgment. See, *e.g., Fallon v. Illinois*, 882 F.2d 1206, 1208-09 (7th Cir. 1989) (factor other than sex need not be related to the job duties, or even be business-related, as long as it is bona fide). The Seventh Circuit also has indicated that a factor would not be negated if it was used without discriminatory purpose but produced a disparate impact. *Fallon*, 882 F.2d at 1211 n.4; see also *Wernsing v. Dep't of Human Servs.*, 427 F.3d 466, 468-69 (7th Cir. 2005) (noting that "employers are free to set their own standards * * * * one the plaintiff makes a prima facie case of discrimination, all the employer need do is articulate a ground of decision that avoids reliance on the forbidden grounds."). Plaintiff has not offered any evidence that the Army was using its authority under the "superior qualifications" regulations to appoint *only* males at higher steps. By establishing that the pay disparities are based on factors other than sex, the Army has met its affirmative burden under the Equal Pay Act and Title VII to demonstrate a legitimate business reason for its decision and thus is entitled to summary judgment on Plaintiff's Equal Pay Act and disparate pay claims.

**B.      Race and Disability Discrimination Under Title VII**

Plaintiff claims that Defendant discriminated against her on the basis of her race and alleged disability in violation of Title VII of the Civil Rights Act when she was fired from her job as an MEPS health technician.[5]  Title VII prohibits discrimination in employment:  "It shall be an unlawful employment practice for an employer * * * to discharge any individual because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  To prove a case of discrimination under Title VII, a plaintiff may show discrimination under either the "direct" or "indirect" methods of proof.  *Atanus v. Perry*, 520 F.3d 662, 671-72 (7th Cir. 2008) (explaining the misleading nature of this nomenclature and reiterating that the direct method may be proven with either direct or circumstantial evidence and that the indirect method proceeds under the burden-shifting rubric set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973)); see also *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007).   Under the direct method of proof, the plaintiff may introduce either direct or circumstantial evidence to create a triable issue as to whether the adverse employment action was motivated by a discriminatory intent.  *Id.*; see also *Isbell v. Allstate Ins. Co.,* 418 F.3d 788, 794 (7th Cir. 2005); *Essex v. United Parcel Serv. Inc.*, 111 F.3d 1304, 1308 (7th Cir. 1997).  In other words, the plaintiff must show either "an acknowledgement of discriminatory intent by the defendant or circumstantial evidence that provides the basis for an inference of intentional discrimination."  *Dandy v. United Parcel Service, Inc.,* 388 F.3d 263, 272 (7th Cir. 2004) (citing *Gorence v. Eagle Foods Ctrs., Inc.,* 242 F.3d 759, 762 (7th Cir. 2001)).  Plaintiff has not presented any direct evidence of discrimination, and therefore must proceed under the indirect method.

---

[5] Plaintiff's complaint also alleged gender discrimination, but Plaintiff has now abandoned this claim as it relates to her termination.  And as previously addressed, her gender discrimination disparate pay claim

Under the indirect method of proof initially set forth in *McDonnell Douglas Corp. v. Green*, a plaintiff first must establish a *prima facie* case of discrimination. 411 U.S. 792, 802-04 (1973). In order to establish a *prima facie* case of race, sex, and/or age discrimination, a plaintiff must establish that: (1) she was a member of a protected class; (2) she was qualified for the job or was otherwise meeting the defendant's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) the defendant treated similarly situated employees outside the protected class more favorably. See *Fane v. Locke Reynolds, LLP,* 480 F.3d 534, 538 (7th Cir. 2007).

If the plaintiff successfully establishes a *prima facie* case, a rebuttable inference of discrimination arises, and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. See *Essex v. United Parcel Serv. Inc.*, 111 F.3d 1304, 1308 (7th Cir. 1997); see also *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007). Once the defendant provides a legitimate explanation, the burden then shifts back to the plaintiff to prove that the proffered justification is pretext. *Fane*, 480 F.3d at 538. The Seventh Circuit has counseled that where a plaintiff has not met his burden of showing that a defendant's explanations are merely a pretext for discrimination, it is not necessary for a court to decide whether the plaintiff also established a prima facie case. See *Holmberg v. Baxter Healthcare Corp.*, 901 F.2d 1387, 1391 (7th Cir. 1990). For example, in *Box v. A & P Tea Co.*, 772 F.2d 1372, 1378 (7th Cir. 1985), the court approved a district court's decision to move directly to the third step of *McDonnell Douglas* where defendant articulated and offered proof of a legitimate, nondiscriminatory reason for adverse employment action. In this case, it makes sense to do just that, since Plaintiff, in her opposition materials, does not put forth any arguments

fails. Plaintiff's complaint also alleged a disability discrimination claim. Despite deposition testimony to the contrary, Plaintiff now maintains that she had not abandoned her disability claim as it relates to her termination.

or admissible evidence related to pretext, despite the non-discriminatory reasons offered by Defendant in its opening brief. [6]

Defendants have offered numerous legitimate non-discriminatory reasons for their decision to terminate Plaintiff, and she has not offered any evidence that any of those reasons are pretext for illegal discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). Here, the Army has established that it terminated Plaintiff because she could not work professionally with other staff members, because she was often aggressive and rude to her coworkers, because she could not work as a team member, and because she had engaged in a pattern of behavior that made the supervisors believe she did not possess the demeanor or attitude necessary to work at the Chicago MEPS. See *Anderson v. Stauffer Chem. Co.*, 965 F.2d 397, 401 (7th Cir. 1992) (poor performance and failure to get along with others constituted a legitimate, nondiscriminary reason for an employee's discharge). Plaintiff repeatedly was counseled, reprimanded, and warned by her supervisors about her aggressive and unprofessional attitude toward her coworkers and her superiors. In both testimony and written notes, Plaintiff's supervisors described her as someone who: (a) was at times "aggressive," "angry," and "standoffish;" (b) did not take instructions well; and (c) had difficulty working as a member of a team. After personally observing an argument between Plaintiff and another staff member, Korljan noted that Plaintiff had engaged in verbal confrontations with almost every member of

---

[6]    Briefly considering whether Plaintiff has made out a *prima facie* case, the Court notes that even if Plaintiff could establish that she was meeting the Army's legitimate expectations—which is unlikely given the numerous written and verbal reprimands and warnings—Plaintiff's race discrimination claim falters because she has not identified another Army employee who engaged in similar conduct and was not terminated. "A similarly situated employee is one who is directly comparable to [the plaintiff] in all material respects." *Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003) (internal quotation omitted). The only person whom Plaintiff believes was similarly situated to her is Christopher Parks, who was a probationary employee at the time Plaintiff was terminated. But Plaintiff has no evidence that Parks was ever formally counseled or reprimanded by a supervisor about his behavior or attitude, let alone with the same frequency that Plaintiff was counseled and/or reprimanded.

the medical section, including the chief medical officer and the in-house psychologist. Similarly, Plaintiff was warned repeatedly by another supervisor, Mary Walker, that she had been "very rude to staff members."

Since Defendant has put forth a non-discriminatory explanation for its termination of Plaintiff, the burden now shifts to Plaintiff to prove that the bias-neutral reason proffered by Defendant was a pretext or an explanation designed to obscure the unlawful discriminatory employment action. *Emmel v. Coca-Cola Bottling Co. of Chicago,* 95 F.3d 627, 629 (7th Cir. 1996). In order to avoid summary judgment, a plaintiff must show that the reason given is unworthy of credence. See *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097 (2000). To accomplish this requirement, a plaintiff must provide evidence to prove that Defendant's reasons were either factually baseless, were not the actual motivation for the action, or were insufficient to motivate the action. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 888-89 (7th Cir. 2001). To avoid summary judgment, Plaintiff must show by a preponderance of the evidence that this proffered reason is pretextual. A plaintiff shows that a reason is pretextual "directly by persuading the court that a discriminatory reason more likely motivated the [defendant] or indirectly by showing that the [defendant's] proffered explanation is unworthy of credence." *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). An employer's decision to promote is pretextual when "it is a lie – a phony reason meant to cover up a disallowed reason. Otherwise, an employer's decision to favor one candidate over another can be 'mistaken, ill-considered or foolish, [but] so long as [the employer] honestly believed those reasons, pretext has not been shown.'" *Id.* (quoting *Millbrook v. IBP, Inc*., 280 F.3d 1169, 1175 (7th Cir. 2002)). In order to establish pretext, Plaintiff must show that Defendant's articulated reason for its decision (1) had

no basis in fact; (2) did not actually motivate the Defendant's decision; or (3) was insufficient to motivate the action. *Hughes v. Brown*, 20 F.3d 745, 747 (7th Cir. 1994). Plaintiff must "*specifically* refute facts which allegedly support the employer's proffered reasons"; conclusory statements about an employer's prejudice are insufficient to establish pretext. *Alexander v, CIT Tech. Fin. Servs., Inc.*, 217 F. Supp. 2d 867, 890 (N.D. Ill. 2002) (emphasis in original).

There is nothing in the record that would support a finding that Defendant's stated reason for terminating Plaintiff was a fabrication. In responding to Defendant's statement of facts regarding her numerous reprimands, Plaintiff admits that Defendant has come forward with documents and testimony to support the facts alleged, but each time she denies, without citation to any record evidence, that the testimony and records "are an accurate summary of the events they purport to describe." Plaintiff's unsupported denials are simply insufficient to establish pretext. Plaintiff has not come forth with any evidence that the reasons offered by Defendant— that Plaintiff had a bad attitude and did not get along with her co-workers—were lies. In fact, Plaintiff failed to even address pretext in her response brief. Plaintiff has not provided any evidence (other than her subjective beliefs during her deposition) that any decision was motivated by her disability, or demonstrated that her race was a factor in the decision to fire her. There simply is no evidence from which a reasonable person could find that Defendants fired Plaintiff because of Plaintiff's disability or race.

In addition to failing to demonstrate pretext, Plaintiff's discrimination claims falls short of those circumstances in which courts have found discrimination. The fact that there might have been tension or friction between Plaintiff and her co-workers, without more, is not indicative of the alleged discrimination, but perhaps of a difficult working environment and of differences of opinion within that environment – neither of which is actionable. Furthermore, the

Court does not sit as a "super personnel department" to review an employer's business decisions (see *Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 471 (7th Cir. 2000)), and thus cannot adjudicate whether co-workers communicate well, whether Plaintiff's co-workers were insufficiently sensitive to Plaintiff's emotional needs, whether co-workers "liked" Plaintiff, or whether Defendants made accurate, wise, or well-considered employment decisions. *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered"). Finally, Plaintiff's statement of facts fails to point to specific instances of harassment; rather, she alleges generally that co-workers regularly harassed her and discriminated against her, without identifying specific co-workers, referencing dates, or describing the words or conduct that she perceived as discrimination and harassment. Plaintiff's general allegations do not suffice to survive summary judgment.

For the foregoing reasons, Plaintiff has not met her burden of proving that Defendants' articulated nondiscriminatory reasons for firing her were pretext. In the absence of evidence of pretext, Plaintiff's claim of discrimination must fail. Therefore, the Court grants summary judgment in favor of Defendants on Plaintiff's claims of race and disability discrimination.

### C.     Plaintiff's Hostile Work Environment Claim

In order to establish a *prima facie* case of hostile racial work environment, a plaintiff must demonstrate that (1) she was subject to unwelcome harassment; (2) the harassment was based on her race; (3) the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability. *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004); see also *Dear v. Shinseki*, 578 F.3d 605, 611 (7th Cir. 2009). To satisfy her burden, a plaintiff must

present evidence showing "a workplace permeated with discriminatory ridicule, intimidation, and insult." *Id.* at 714. Normally, such allegations of harassment are supported by facts that the Plaintiff is the target of racial slurs, epithets, or other overtly race-related behavior. *Id.* at 713. Defendants maintain that Plaintiff's harassment claim fails for two reasons: first, because the environment that she alleges existed at the time of her employment was not objectively offensive and was not so severe or pervasive that it altered the conditions of her employment; and second, because there is no evidence that any of the alleged harassment was motivated by her race.

As mentioned, in order to sustain a hostile work environment claim, the events complained of must be objectively offensive and so severe or pervasive as to alter the conditions of employment. *Luckie*, 389 F.3d at 714; *Patton v. Indianopolis Public Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) (plaintiff's allegations of being treated in a rude, abrupt and arrogant manner by supervisors and coworkers were not sufficiently sever or pervasive). Like the plaintiff's claims in *Patton*, evidence presented by Plaintiff amounts her own testimony that she was spoken to in a "demeaning" and "authoritative" manner, was "ganged up on," and that she was "yelled at" or "berated by" her coworkers. As previously noted, her statement of facts fails to point to specific instances of harassment; rather, she alleges generally that co-workers regularly harassed her and discriminated against her—without identifying specific co-workers, referencing dates, or describing the words or conduct that she perceived as harassment. Furthermore, even if her perceptions and allegations are correct (and she has not presented any evidence corroborating her own testimony), no reasonable factfinder could find that such conduct was so severe or pervasive that it altered a condition of her employment in any significant way. *Id.*; see also *Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004) (work environment was not objectively hostile within the meaning of Title VII, even when racial and derogatory slurs had

been overheard by African-American employees on a number of occasions).  As the court in *Patton* explained, "Title VII 'does not guarantee a utopian workplace, or even a pleasant one.'" *Id.* (quoting *Vore v. Indiana Bell Tel. Co.*, 32 F.3d 1161, 1162 (7th Cir. 1994); see also *Spearman*, 231 F.3d at 1086 (Title VII is not a "general civility code" for the workplace) (internal citations omitted).  While Plaintiff's allegations certainly establish that she was unhappy at the Chicago MEPS and that her unhappiness was the result of perceived rude and/or aggressive behavior by her coworkers, such allegations fall far short of creating an actionable hostile work environment within the meaning of Title VII.

Moreover, even if Plaintiff could establish that her work environment was objectively offensive or hostile, she has not come forward with any evidence that the alleged harassment or abuse was motivated by her race.  *Luckie*, 389 F.3d at 713-14 (summary judgment appropriate when none of the incidents were sufficiently connected to race); *Patton*, 276 F.3d at 339 (no evidence that supervisor's "abusive" and "rude" treatment of plaintiff was motivated by her race or gender); *Spearman*, 231 F.3d at 1085 (sex harassment claim failed when evidence established that harassment was motivated by plaintiff's suspected homosexuality, not because he was male).  Here, Plaintiff cannot point to a single comment or incident that was racially motivated.  Instead, she simply argues that the harassment must have been racially motivated because some, *but not all*, of the alleged perpetrators were African-American.  See *Dear*, 578 F.3d at 611 (summary judgment appropriate when best evidence is plaintiff's allegations that her problems within the department derived from white staff members and supervisors).  Plaintiff also admitted that not all of the harassment and "abuse" that she alleges occurred because she was white.  Finally, Defendants presented evidence that two other white members of the Chicago MEPS medical section denied witnessing or experiencing any racial tension, harassment, or abuse, let alone

racially motivated harassment or abuse. As Plaintiff has not presented evidence connecting the alleged harassment to her race and has failed to demonstrate that the events complained rise to the level needed to show a hostile work environment, the Army is entitled to summary judgment.

### D.    Disability Discrimination

Because it is difficult for the Court to decipher exactly what type of claim Plaintiff brings regarding her disability—whether it is limited to being terminated on account of her disability (addressed *supra*) or whether it goes beyond her termination—the Court briefly and separately addresses Plaintiff's allegations with respect to her disability. Plaintiff alleges at various points that the Army discriminated against her on the basis of her disability, which she claims is an anxiety disorder. In her amended consolidated complaint, Plaintiff alleges that the Army failed to accommodate her disability. However, at the same time, Plaintiff testified that she never requested any accommodation because none was necessary. Additionally, although Plaintiff at times argues that she was discriminated against on the basis of her "disability," she admits that she was not harassed or abused *because* she had an anxiety disorder. Instead, Plaintiff argues that the harassment "caused" her anxiety disorder, and, at worst, that her coworkers harassed her in order to "exacerbate" her stress and anxiety. Also, during her EEO case, Plaintiff testified that her medical condition does not impact any of her major life activities. Finally, she admits that she never provided any documentation or record of this condition to the Army at any point during her employment.

The Americans with Disabilities Act was enacted in 1990, after Congress determined that "many people with physical or mental disabilities" have been prevented from "participat[ing] in all aspects of society" and "have been subjected to discrimination." 42 U.S.C. § 12101(a)(1). For purposes of the Act, the word "disability" includes "a physical or mental impairment that

substantially limits one or more major life activities" and also includes "being regarded as having such an impairment." *Id.* at §§ 12102(a)(1)(A), (C); 12102(a)(3); see also *id.* at § 12102(a)(1)(B).

Plaintiff argues that there is a question of fact as to whether the Army regarded her as disabled, but fails to cite to any admissible evidence that might create such a question. She testified that Mary Walker allowed her to request breaks if she was feeling upset or anxious. But allowing an employee to take short breaks if she gets upset or anxious does not equate with regarding an employee as disabled. Additionally, inasmuch as Plaintiff's complaint is that Defendants failed to accommodate her disability, that argument is not well-taken. *Refusal* to accommodate may serve as an independent basis of liability under the ADA (see, *e.g.*, *United States v. Georgia*, 546 U.S. 151, 157 (2006); *Dadian v. Village of Wilmette*, 269 F.3d 831, 838-39 (7th Cir. 2001); 28 C.F.R. § 35.130(b)(7)), but the Court is not aware of a case in which a failure to accommodate was successfully argued without an accompanying request to accommodate. Indeed, the case law in this realm presupposes a request. See *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 632, 633 (7th Cir. 1998) (describing as an "interactive process" the making of accommodations in the under the ADA in employment cases); *Hunt-Golliday v. Metropolitan Water Reclamation Dist. of Greater Chicago*, 104 F.3d 1004, 1012 (7th Cir. 1997). And the Seventh Circuit teaches that determining whether a *requested* accommodation is reasonable "is highly fact specific, and determined on a case-by-case basis by balancing the cost to the defendant and the benefit to the Plaintiff." *Dadian*, 269 F.3d at 838; *Washington v. Indiana High Sch. Athletic Ass'n*, 181 F.3d 840 (7th Cir. 1999) ("*refusal* to make a reasonable accommodation" is a basis for liability under the ADA) (emphasis added). Because Plaintiff specifically states in her deposition that she did not ask for an accommodation, there was no

request for Defendants to refuse in the first place. Moreover, Plaintiff's own testimony is that her supervisors accommodated her stress by suggesting that she take breaks if she was feeling upset or anxious.

Plaintiff also points to the Seventh Circuit's decision in *Palmer v. Circuit Court of Cook County, Ill.*, 117 F.3d 351 (7th Cir. 1997), as support for her claim of disability discrimination. In that case, the plaintiff alleged that she was discriminated against on the basis of her disability (severe depression and paranoid delusions) when she was terminated after threatening to kill a co-worker. *Palmer*, 117 F.3d at 352. The district court granted summary judgment in the employer's favor because it determined that depression and anxiety were not disabling conditions within the meaning of the Americans with Disabilities Act. *Id.* at 352. In so doing, the district court found that the plaintiff had merely experienced a personality conflict with a co-worker that led her to suffer severe anxiety and depression. *Id.* The Seventh Circuit disagreed with the district court on that point, holding that it was clear from the record that the personality conflict identified by the district court had triggered a disabling condition, but agreed that summary judgment was still appropriate because the record did not support the plaintiff's claim that her termination was motivated by her disability. *Id.* at 353. Rather, the court held that the defendant had terminated the plaintiff because she threatened to kill her co-worker, and that such threats made the plaintiff unqualified to perform her job, even though the threats were precipitated by plaintiff's disabling condition. *Id.*

The key distinction between *Palmer* and this case is that there is no evidence that Plaintiff was suffering from anything more severe than anxiety, which may have been caused by her conflicts at work, but was not disabling. As the Seventh Circuit explained, "The judge was certainly correct that a personality conflict with a supervisor or coworker does not establish a

disability within the meaning of the disability law, even if it produces anxiety and depression, as such conflicts often do." *Palmer*, 117 F.3d at 353. And to the extent that Plaintiff contends that the fact that she was diagnosed with an anxiety disorder while working at Chicago MEPS is evidence that she was subjected to a hostile work environment, her hostile work environment claim fails because she has not produced even a scintilla of evidence that could establish that her co-workers' alleged behavior was *motivated by* her alleged disability, and, moreover, the general allegations that she makes regarding her co-workers conduct cannot be said to be objectively offensive or severe and pervasive. Finally, to the extent that she contends that her termination was an act of discrimination, her disability claim fails for the same reasons previously discussed—the Army has offered evidence that she was not performing her job to the Army's legitimate expectations and she has not demonstrated that the Army's reasons were pretextual.

## IV.    Conclusion

For these reasons, the Court grants Defendants' motion for summary judgment [52] and enters judgment in favor of Defendants and against Plaintiff on all claims.

Dated:  March 3, 2011

_____
Robert M. Dow, Jr.
United States District Judge